DICK SOWELL v. THE STATE.

*No. 629. Decided December 20.*

1. **Charge of Court — Practice on Appeal.—** In the absence of exceptions to the court's charge, and failure to request instructions, the appellate court will not reverse for error or omission in the charge, unless upon the whole record the error was calculated to injure the rights of defendant.

2. **Same — Test as to Sufficiency with Regard to Lesser Degrees.—**On a trial for assault with intent to murder, the test as to whether the evidence requires a charge upon a lesser degree of crime is, was it of such cogency as that had the charge been given it would probably have influenced the finding of the jury.

3. **Same — Manslaughter— Practice.—**On a trial for assault with intent to murder, where there is sufficient evidence requiring a charge on aggravated assault, arising out of the law of manslaughter, a failure to so charge, when excepted to, will constitute reversible error, and especially so if in addition to the exception a special requested instruction for the defendant submitting the law of manslaughter was refused by the court.

4. **Charge of the Court not Limited or Restricted by Defendant's Testimony or Theory of the Case.—**On a trial for assault with intent to murder, where defendant's testimony, as well as theory, tended to establish a case of self-defense, but there was other testimony presenting other issues than self-defense: *Held*, that the court was not limited and restricted by the testimony of defendant as to the issues to be submitted, but should have submitted to the jury each and every phase of the case suggested by the evidence, whether the theory be presented by the evidence of the State, or defense, or both.

APPEAL from the District Court of Bastrop. Tried below before Hon. LAFAYETTE KIRK.

On a trial under an indictment charging him with assault with intent to murder one W. N. Erwin, defendant was convicted of that offense, with his punishment assessed at two years in the penitentiary.

Under instructions of the court, we give the testimony shown in the statement of facts, as follows:

W. N. Erwin, for the State, testified: That on the 30th day of August, 1892, in the town of Paige, in Bastrop County, Texas, the defendant, Dick Sowell, shot at witness while witness was on the gallery of his saloon, the ball striking witness and inflicting a wound in the rear of witness' person near his left hip. That defendant came into the front part of witness' saloon, at about good dark, with an open knife in his right hand, which he drew on witness, and told witness that witness' little son and Dr. Banks' son had turned his horse loose, and said that if I did not whip my son for it, that he would. I said, "All right, Dick, if my son did that I will whip him for it." And defendant then cursed me and cursed my little son, who was near us, and who commenced crying when he heard defendant cursing him. I then picked up a chair to strike defendant with while he had the knife drawn on me and was cursing me so, and I then

started towards him, with the chair drawn to strike him with it, and he then backed out of the room, with his knife drawn on me. I followed him with the chair drawn, and after he passed backward through the door on to the gallery, I struck him with the chair one time while I held the chair in my hands, and knocked the knife out of his hand at this blow, and I then threw the chair at him, and struck him with it. He then left the place, and in about one hour, as I was sitting down on the front gallery of my saloon, I saw the defendant returning. When I first saw him he had his hands behind his back, but he suddenly threw a gun to his front as if to shoot, and I jumped up immediately, and as I got on my feet the shot was fired, which struck me as I have stated. He was about thirty or forty feet from me when he fired. After striking me the same ball also struck Charley Tate, who was on the other side of me from the defendant. At the time this shot was fired myself, Charley Samuels, Harry Washington, Awalt Stork, T. B. Greenhaw, and Charley Tate were the only persons present besides Dick Sowell. All were on the gallery except Sowell. I was sitting in the door leading from the gallery into the house, and T. B. Greenhaw was sitting near me, on the other edge of the gallery, at the time we first saw defendant returning with the gun. At the time defendant drew the knife on me, when I struck him with the chair, Awalt Stork, T. B. Greenhaw, Charley Samuels, and Charley Tate were present. Defendant lived about three-fourths of a mile from my saloon. He shot me as I jumped in the door. There was a very short time between the two shots, hardly a quarter of a minute. When the boy commenced to cry, defendant said, "You need not cry, God damn you; I'll do you and your daddy;" and I said, "Dick, you are a fool when you get a drink or two. I will knock the stuffing out of you."

Cross-examined: I have told all that I remember, and all that I said. Between sundown and dark my little son asked me to let him go down to Dr. Banks' to play with Dr. Banks' boy, and I let him go. Defendant's horse was hitched down in the direction of Dr. Banks' at this time, and I do not know whether he was turned loose or not. The defendant and myself are first cousins, and have known each other all of our lives, and have always, before this occurred, been on the friendliest terms. The witness being requested to explain what he meant by saying that defendant drew his knife on him and had it drawn on him when he struck him with the chair, says, defendant just walked into the house and up to witness with the knife open and in his right hand, with his hand and right arm dropped full length down his right side, with the hand a little in front, and held the knife in that position until he was backed out of the house by witness and was struck with the chair, when the knife dropped out of defendant's hand, and has been in witness' possession ever since, and is now in witness' possession, and was by him exhibited in open court. Being requested to explain the difference between the way a man

would appear in merely having a knife open in his hand down by his side, with a harmless purpose, and the way one would use it in drawing it on another, witness says he can not explain such difference.    He says that defendant never struck at witness nor drew the knife on him in any other way than as witness has stated.    When defendant first came up to me with the knife, he commenced to talk in a friendly and quiet manner, and I said, "Dick, you are always a fool when you are drunk," and I said, "You had better leave here."    This was in my saloon, and I saw defendant take two or three drinks in my saloon that evening, and he may have taken more than that.    I do not know how bad I hurt the defendant, but I hit him as hard as I could, and gave him pretty hard licks, and must have hurt him pretty bad.    I did not knock him down the first blow with the chair, but do not know whether I knocked him down the second blow or not.    The second blow knocked him off the gallery.    At the time defendant was struck with the chair, his horse he was riding that evening was then hitched to the gallery of my saloon, near where he was struck with the chair; but defendant ran off in the direction of his home as soon as he was struck, and left his horse hitched to the gallery of the saloon, and his horse was still hitched to the gallery we were sitting on at the time the first shot was fired.

I had a butcher knife and a six shooter, which I kept there all the time, and I kept a double barrelled gun there a part of the time.    I kept the butcher knife in the saloon to cut sausage and cheese with.    T. B. Green-haw was a constable at the time, and although in the house at the time the cursing and swearing was done, and the knife drawn at the time I struck defendant with the chair, he neither commanded the peace nor made any arrest, or took any notice whatever of the same.    The disturbance was in the front part of the house and on the front gallery, and he was sitting at a table with Charley Tate, a prisoner under arrest, in the rear end of the saloon.    The saloon is about thirty feet by fifty feet long, with no partitions in it.    I do not know where the witness Charley Tate now is. I do not know whether Greenhaw, the constable, heard the defendant cursing me in the saloon and saw him with the knife drawn, and saw me with the chair drawn and striking defendant with it, or not, but I suppose he did, as there was nothing to prevent his seeing and hearing it, he being in the saloon all the time, about twenty-five or thirty feet from us, and there being nothing to obstruct his view or hearing that I know of.

T. B. Greenhaw, for the State, said:    That he was present on the 30th day of August, 1892, in Paige, in Bastrop County, Texas, when the defendant, Dick Sowell, shot W. N. Erwin with a gun.    It was a breech loading single shot, about 38-calibre rifle.    Charley Samuels, A. Stork, Harry Washington, Charley Tate, and myself were there on the gallery at the time the shooting occurred.    About twenty-five or thirty minutes before the shooting, defendant was in the front part of the saloon, talking with

W. N. Erwin, and they both walked out on the gallery together, and I heard a noise as if somebody throwing or falling over a chair, but I did not see anybody with a knife, and did not see anybody strike another with a chair, and heard no cursing or growling. At the time of the shooting, Charley Samuels, Awalt Stork, Harry Washington, W. N. Erwin, Charley Tate, and myself were sitting on the gallery of the saloon, and I looked and saw the defendant, Dick Sowell, in the street, about ten or fifteen feet from the corner of the gallery, with his hands behind his back, and he suddenly threw his gun in front and presented it as if to shoot, and as we jumped up he fired the shot that struck both Erwin and Charley Tate. He then turned and ran off in the direction of his home, and I jumped off of the gallery and drew my pistol and followed him, and ordered him to stop, and as I got across the street, and had gone about sixty feet from the gallery, I overtook him, and again ordered him to stop, when he presented his gun at me as if to shoot, and I then shot at him while he had his gun presented at me, and he then ran in the direction of his home. I then summoned some men to help arrest him, and followed him to his home and arrested him. He lived about three-fourths of a mile from the saloon.

There were only two shots fired, one of which was by defendant when he shot Erwin and Tate, and the other was by me after I had run about sixty feet from where I was when the first shot was fired. I think it was about twenty-five or thirty minutes from the time of the disturbance when defendant is said to have been struck with a chair, until the shot which wounded W. N. Erwin was fired. At the time the first disturbance occurred I saw Erwin with a chair on the gallery, but did not see him strike with it.

Cross-examined: I was constable at the time the defendant is charged with this offense, and had Charley Tate as a prisoner. I had instructions from the sheriff of Lee County to arrest a man of a certain description, by the name of Jackson, and as Tate answered the description, I asked him if his name was Jackson, and he said yes, and I then arrested him and turned him over to the sheriff of Lee County for the man Jackson wanted by him, but the sheriff of Lee County said he was not the man he wanted, and turned him loose. I do not know where Tate now is. I saw the defendant at the time he came into W. N. Erwin's saloon, at the time he is said to have cursed Erwin and Erwin's boy, and said to have had an open knife and drawn in his hand, but I did not see the knife nor hear defendant cursing. I was in the rear part of the room, about twenty or twenty-five feet from the parties, at the time. I also saw defendant and Erwin at said time when they went out of the saloon on to the gallery at the time the chair is said to have been used by W. N. Erwin on the defendant. They walked out of said saloon on to the gallery together, and I heard the noise made by the chair immediately after they

got on the gallery; but did not see Erwin with the chair in his hands except as I have stated.  I did not know that there was a row between them, or that there was any disturbance, and I never suspected there would be any trouble from the manner in which they left the room.  The defendant's horse which he was riding that evening, with the saddle, bridle, and blanket on it, was hitched to Erwin's front gallery on which we were sitting at the time the first shot was fired, and had been there at the time and ever since the chair was said to have been used on defendant by Erwin; and after defendant refused to surrender to me near the scene of the shooting, I got on this horse and followed him to his house.  When I first attempted to arrest him at his house he refused to surrender to me, saying he was afraid I would hurt him or permit him to be hurt, and demanded that I go and get Otto Ebner and some of his friends to accompany me, saying he would surrender to me in that event; and when I got Otto Ebner and other friends of defendant to assist in arresting him he immediately surrendered to me.  Defendant had served four years as constable of Paige precinct.  Defendant said I was in with Erwin, and he would go with me to the sheriff of Bastrop County, or any other county, if I would go and get those friends of his, but that he did not want to go back to Paige.

Charles Samuels, for the State, testified:  That he was sitting on the gallery when the defendant, Dick Sowell, fired the shot which wounded W. N. Erwin and Charley Tate.  That witness was not present at the trouble when it is said that W. N. Erwin struck the defendant twice with a chair.  At the time the shooting occurred, W. N. Erwin, Charley Tate, T. B. Greenhaw, Harry Washington, Awalt Stork, and myself were sitting on the gallery, Erwin being at the door entering the saloon from the gallery, and Greenhaw being not far from him, but near the outer edge of the gallery.  When defendant got in about ten or fifteen feet of the gallery, he threw a gun from behind him, and presented it at Erwin and fired, and Greenhaw immediately stepped off of the gallery and fired at him as he ran off in the direction of his home.  After defendant left the gallery at the time it is said he was struck with the chair, and about three minutes before he returned, I struck my foot against something on the gallery floor, which I picked up and found to be defendant's pocket knife, which I gave to W. N. Erwin.  Greenhaw was right at the edge of the gallery when he fired at defendant as he was running off, and not more than one-quarter of a minute had elapsed since defendant fired at Erwin.

Cross-examined:  I saw the defendant at the time T. B. Greenhaw shot at him.  He was about seventy-five yards from Greenhaw at the time, and had his back turned toward Greenhaw, and was running from him in the direction of his home at the time Greenhaw shot at him; Greenhaw being at the time on the same side of the street the saloon is on, and only

a few feet from the saloon and on the opposite side of the street from the defendant.

Awalt Stork, alias E. C. Stork, for the State, testified: That he was in Erwin's saloon at the time Erwin is said to have used the chair on defendant, Dick Sowell, and was on the gallery of the saloon at the time defendant fired the shot that wounded W. N. Erwin and Charley Tate. W. N. Erwin, T. B. Greenhaw, Charley Samuels, Charley Tate, Harry Washington, and myself were on the gallery at the time the shot was fired. Defendant came walking across the street with his hand behind his back, and when he got in about ten or fifteen feet of the corner of the gallery he suddenly threw his gun around in front of him, and immediately fired the shot that wounded Erwin and Tate, and immediately ran off, and Greenhaw immediately shot at him as he was running off in the direction of his home, Greenhaw at the time being still on the gallery, or very near to it, when he fired at defendant as he was running off; and not more than one-quarter of a minute, if that, having elapsed between the shot fired by defendant and the one by Greenhaw, and defendant's back being toward Greenhaw when Greenhaw fired at him.

Cross-examined: I am bartender for W. N. Erwin, and was at the time the shooting occurred. I saw defendant when he came into the saloon, cursing W. N. Erwin and W. N. Erwin's boy, but did not see any knife in his hand at any time, and did not see Erwin strike him with a chair, nor see a chair at any time in Erwin's hands. I saw them go on to the gallery from the saloon. They walked along together, and I did not suspect that either was going to strike the other until I heard the racket on the gallery. I was in the front part of the saloon all of this time, behind the bar.

Harry Washington, for the State, testified: That he was not present at the time W. N. Erwin is said to have struck defendant twice with the chair, but was present, and on the gallery, at the time defendant fired the shot that wounded W. N. Erwin and Charley Tate. We were sitting on the gallery, when I saw defendant come up in about ten feet of the gallery and throw his hands from behind him and present his gun and fire at W. N. Erwin. Defendant then ran off in the direction of his home, and as he was running off T. B. Greenhaw fired at him with his pistol. Greenhaw was on the gallery when he fired at defendant..

Cross-examined: I am porter at W. N. Erwin's saloon, and was at the time this shooting occurred. T. B. Greenaw was on the gallery of Erwin's saloon when he shot at defendant, and he shot at him immediately after defendant shot at Erwin. At the time Greenhaw shot at defendant, defendant was running off as fast as he could, and had got 200 or 300 yards before Greenhaw fired at him. I am certain that Greenhaw fired at defendant immediately after the defendant fired at Erwin, and that Greenhaw was on the edge of the saloon gallery when he fired at defend-

ant, and I am also certain the defendant was off 200 or 300 yards, running at the time.

Otto Ebner, for the State, testified: That at about one-half hour by sun, as near as witness can fix the time, as he was about to leave Paige to go home, on the evening of the day W. N. Erwin was shot by defendant, as witness was crossing the street at the corner at Erwin's saloon, witness met the defendant in the street, and requested him to go back with him to Erwin's saloon and take a drink of beer with him, to which defendant replied, that he would not do so; that he intended to quit drinking anyway. Witness then said, "If you will stick to that it will make a man of you." Defendant then replied, that he did not like Erwin; that Erwin had not been treating him right; and putting his right hand in his right hand coat pocket, he took therefrom an open pocket knife, and holding the knife out to me, he said, "I have got this for Bill Erwin. I am going to hurt him. I am going to do him with this."

Cross-examined: I am sure the defendant did not have the knife in his hand when I first met him, and I am sure he did not at that time have his hand in his pocket. I am certain the knife was in his coat pocket, and was open while in his coat pocket, when I first met him, because I saw him put his empty right hand in his right hand coat pocket, and I saw that the knife was open in his coat pocket at the time he was taking it out. I can not describe the coat defendant had on at the time, but I am certain he had on a coat at the time, and that the open pocket knife was taken by him from the right hand coat pocket.

At the request of counsel for defendant, the witness here stood up before the jury and illustrated to the jury the manner in which he saw defendant take the open pocket knife from his coat pocket, by placing his empty right hand in witness' own right hand coat pocket and taking therefrom an open knife. The witness was then asked by defendant's counsel, if he did not know that neither the witness nor the defendant, or any of the parties mentioned, had on any coat at any time during the hot weather of the day mentioned (August 30, 1892), to which the witness replied: "I think the defendant had on a coat at the time mentioned. I am as certain that defendant had on a coat at the time mentioned as I am that I saw his knife, and that he made the remark about the knife; and if I am mistaken as to one I am also mistaken as to the other." The witness further states, that he never at any time told the district attorney of the matters testified to by him, and does not think that he ever told anybody else about it before he was now placed upon the witness stand, and does not know how it became known that he would testify to such matters.

Re-examined: The witness being asked by John McPhaul, Esq., private counsel employed to assist in the prosecution, if he did not tell said

McPhaul, at the last term of court, of the matters he had testified to, the witness replied, that he believed he had, but was not certain as to this.

W. B. Kirkpatrick, for the State, testified: That on the 30th day of August, 1892, he was living with the defendant, and had been picking cotton for him. That in the early part of the night of that day defendant returned home from Paige, on foot, and said that W. N. Erwin had knocked him down with a chair, and he got his gun, and said he was going back to kill Erwin, and he left with his gun and went in the direction of Paige. In a very short time I heard two shots fired in the direction of Paige, and I then started to Paige to see who was hurt, and found that defendant had shot Erwin. Defendant was at his house about five or ten minutes, and I saddled the horse he returned on.

Cross-examined: The defendant said, at the time he got his gun to go to Paige to kill Erwin, that his horse was hitched to Erwin's saloon gallery, and that Erwin had, without any cause, knocked him down with a chair, and hurt his head and shoulder, and nearly killed him, and run him off from his horse; that he was going back to get his horse, which was hitched to the gallery of Erwin's saloon, and that he would take the gun along to defend himself with if he was again assaulted by Erwin when he went there to get his horse. The defendant did not appear to me to be much excited. Defendant did not say that he was going to kill Erwin in any event, but said that he was going back to Erwin's saloon to get his horse, which was hitched to the front gallery of Erwin's saloon, and that he wanted the gun to defend himself with, and to kill Erwin if Erwin assaulted him again as he said he had done. I had not known defendant but two or three days.

Here the State closed.

W. N. Erwin, witness for the State, being recalled by the defendant, testified: That a month or two after he was shot by defendant, witness had a conversation in Paige with Dick Hall, in regard to some trouble that had occurred between Dick Hall's father and defendant. Witness positively denies that he said to Dick Hall, in said conversation, that if he would kill defendant he would not be hurt for it. On the day that witness was shot by defendant, the defendant was in his shirt sleeves and had no coat on. Defendant may possibly have had on a vest or a jacket of some kind, but I am pretty certain that he did not have on a coat of any kind, and to the best of my belief he was in his shirt sleeves, with neither a coat nor vest or jacket of any kind on at any time that day.

William Highsmith, for defendant, testified: That on the 30th day of August, 1892, the day defendant is said to have shot W. N. Erwin, witness resided in Paige, about 200 yards from W. N. Erwin's saloon, and witness was at his home, about 200 yards from the shooting at the time it occurred. There were only two shots fired at the time, and they were fired one immediately after the other, being only a few seconds apart. I

can not say whether there was as much as one-quarter of a minute elapsing between the two shots or not.

Dr. Banks, for the defendant, testified: That at the time the shooting occurred he resided on the opposite side of the street from Erwin's saloon, about sixty yards below Erwin's saloon. That at about good dark witness heard a racket and disturbance of some sort at Erwin's saloon, but he could not recognize anybody's voice except Erwin's, and could not tell what the disturbance was. After this, witness went on to his own gallery, which fronted Erwin's saloon gallery, but was some sixty yards below it, and sat down on a chair on witness' gallery, and while witness was sitting there he heard one shot fired in the direction of Erwin's saloon gallery, and upon hearing this first shot witness instantly looked in the direction of the gallery, and immediately upon his looking in the direction of the gallery he saw the flash and heard the report of a gun or pistol, which was fired by some one either on or very near Erwin's saloon gallery. There were but two shots fired, and only a few seconds elapsed between them. I was sitting with my face towards them, and there was nothing to obstruct my view except the darkness of the night, and when I heard the first shot I looked in that direction as quickly as I could, and as soon as I looked in that direction I saw the flash and heard the report of the second shot fired. This shooting occurred about twenty or thirty minutes after I heard the preceding racket and disturbance at the saloon. W. N. Erwin's little boy came over to play with my boy at between dark and sundown, but I do not know whether the boys turned defendant's horse loose or not. Defendant's horse had been tied to Erwin's saloon gallery before dark on that day.

Dick Hall, for the defendant, testified: That about one month or two after defendant is charged with shooting W. N. Erwin, he had a conversation, in Paige, with W. N. Erwin in regard to some trouble my father had with defendant, and in that conversation W. N. Erwin said that if I would kill defendant I would not be hurt for it.

Cross-examined: In that conversation I told Erwin that I had heard that my father and defendant were going home together at night, both being drunk and on the same horse, and that they got down to fight, and that defendant knocked my father down and stamped him.

Re-examined: I also told Erwin in that conversation, that I had investigated the matter and found that my father was wholly to blame in his trouble with defendant.

T. B. Greenhaw, a witness for the State, recalled by defendant, says: That he has no feeling of any kind against the defendant. He says, however, a year or two ago he did knock the defendant down in Paige, and give him a pretty good beating while he, the witness, was constable, and while the defendant was pretty drunk. I took two or three drinks with

the defendant on the evening the shooting occurred, late in the evening. I do not think the defendant had on a coat or a vest or a jacket that day.

Re-examined: The way the trouble came up when I gave defendant the beating was, I told the defendant he stole 50 cents from me, and he then jumped on me, and I knocked him down and gave him the beating.

Mrs. Sowell, for defendant, testified: That she is the wife of the defendant. That in the evening of the shooting the defendant went to Paige on horseback, and shortly after dark he returned to his home on foot, and said that W. N. Erwin had knocked him down with a chair and nearly killed him, and had driven him away from his horse, which he said was tied to Erwin's saloon gallery. He got another horse and his gun, and said he was going back to the saloon to get his horse, and that if Erwin run on him again he would kill him with the gun. Defendant complained at the time of his head and shoulders being badly hurt by Erwin, and he was very much excited and angered, more so than I have ever seen him before or since. I heard all the defendant said in the presence and hearing of W. B. Kirkpatrick. Defendant was greatly excited and angered at the time Kirkpatrick heard him make the remarks, and he complained at the time of his head and shoulders being badly hurt and causing him great pain. He said, at the time, that he was going back to get his horse which Erwin forced him to leave there, and that he took his gun to defend himself with; and he did not say he was going to kill Erwin, except when he said he would kill him if he run on him again. Defendant was still very much excited and greatly angered, and complaining of suffering from the injuries he received from Erwin, at the time he left with his gun to return to the saloon after his horse. When T. B. Greenhaw came to defendant's home that night, immediately after the shooting, to arrest him, the defendant told Greenhaw that he was afraid to trust him, and refused to surrender to him unless he got some of defendant's friends to come with him; and when Greenhaw got some of defendant's friends to assist in the arrest the defendant at once surrendered to him. The defendant never had on any coat or jacket or vest of any kind at any time on the day the shooting occurred.

Dick Sowell, the defendant, being introduced as a witness in his own behalf, testified: That there was not a word of truth in the testimony of Otto Ebner, to the effect that he met defendant on the street just before night on the day of the shooting, and had a conversation with him about W. N. Erwin. That defendant did not at any time on that day have on any coat or jacket or vest of any kind, and did not at any time make the statements to said Ebner or any one else, about W. N. Erwin, as testified to by said Ebner. That witness has no recollection at all of meeting said Ebner on said day, but witness is certain that he never showed any knife to said Ebner, and never made any remarks of any kind to or in hearing of said Ebner about Erwin; and witness denies everything in regard to

the matters testified to by said Ebner. That at about dark on the day the shooting occurred somebody turned both witness' and Greenhaw's horses loose from the gallery where they were hitched, and witness found them both in the alley behind Dr. Banks', and told Greenhaw where his horse was at the time defendant carried his horse back to the gallery and hitched him. Witness believed that Erwin's boy turned his horse loose, because he saw him fooling around there, and knew that he was a mischievous boy; and when witness went to Erwin to tell him about it he did not expect to have a row with Erwin about it. He just happened to have his knife open in his hand at the time; but never thought of using it or having any trouble with Erwin about the matter. That when witness told Erwin about the matter, in a quiet and friendly manner, Erwin got mad and excited, and cursed witness and ordered him out of the house, and then picked up a chair, and while holding the chair in his hands he struck witness a powerful blow, and as hard as he could, on the head with it, and ordered witness to leave there, and as witness started off he threw the chair at witness as hard as he could, and knocked witness down with it, and witness got up as quickly as he could and immediately ran home.

When witness received the first blow with the chair he was struck on the left side of the head and on the left ear, and was made deaf in that ear by the shock, and a large lump was made on his head; and when he received the shock of this blow his knife fell from his hand. That witness never struck Erwin at any time, and made no effort to strike him, and neither by word or act manifested any purpose to strike him. That witness was struck on the head and shoulder the second time he was struck by Erwin, when Erwin threw the chair at him as he was leaving, and his head and shoulder were also severely injured by this blow. It was several weeks after these injuries were received before witness recovered from the injuries received and before he recovered his hearing in his left ear. Witness thought some of his bones in his shoulder were broken, from the manner in which his shoulder pained him. Witness ran home as quickly as he could after he received these injuries, and got his gun and another horse, and returned immediately to Erwin's saloon to get the horse he was compelled to leave there; and after he had hitched the horse he returned, and as he started up to Erwin's gallery to get the horse he had left there, and when he got in about ten or fifteen feet of the gallery, witness heard T. B. Greenhaw, who was sitting on the gallery, say to W. N. Erwin, who was also sitting on the gallery, " Look out, Bill; get your gun; there comes Dick;" and as Greenhaw said this he jumped up and drew his pistol, and Erwin also jumped up, and as Erwin, who was nearer me than Greenhaw, jumped up, I shot at Erwin, and Greenhaw shot at me at about the same time. I think I shot a little before Greenhaw did. I did not have my gun nor my hands behind my back at any time as I

walked up, and I did not at any time throw my gun up or present it before Greenhaw made the above remark, or before he began to draw his pistol. I had my gun before me, in plain view, all the time as I walked up towards the parties where my horse was, and never shot or attempted to shoot, and never made any demonstration with it as if to shoot, until after Greenhaw made the above remark, and until he and Erwin jumped up and he began to draw his pistol.

I never at any time had any intention to shoot Erwin, until it became necessary for me to shoot him in self-defense. I intended to get my horse which was hitched to his gallery that he and Greenhaw were sitting on, and take him away without any more trouble, if I could; and I brought my gun only to defend myself with it should Erwin again attack me in the way he did. The two blows I received from Erwin caused me great physical suffering and pain, which lasted for some time after the shooting occurred, and these two blows greatly excited, frightened, and angered me, and I was still under the influence of this physical suffering and pain and excitement, fright, and anger, at the time the shooting occurred. The reason I would not be arrested by Greenhaw without some of my friends being present, was because I was afraid of him. He was present when Erwin cursed me and beat me at the saloon with the chair, and did not command the peace nor arrest Erwin, and he had previously knocked me down while I was drunk, without any cause, and severely beat me; and when I started to the gallery he was the first one to move, and when he jumped up and began to draw his pistol and said to Erwin, " Look out, Bill; get your gun; Dick is coming," I thought he wanted to have me killed.

Cross-examined: I will tell the truth about it. Yes, when I saw Greenhaw jump up and commence to draw his pistol, and make the remark to Erwin, I shot at Erwin. Greenhaw told Erwin to get his gun, and I knew Erwin had a gun, and I thought Erwin would shoot at me first.

The court only charged upon assault to murder and self-defense.

Defendant's counsel requested six instructions upon the law of manslaughter, as presenting the issue of aggravated assault, which were refused by the court, and exceptions were duly reserved.

*H. M. Garwood* and *J. P. Fowler*, for appellant.—1. The charge makes no reference to manslaugter or aggravated assault, and it was specially excepted to on the ground of this omission, and special instructions presenting this view of the law were requested and refused by the court.

There was evidence before the court tending strongly to show, that a very short time before the defendant is charged with the commission of the offense, an unlawful, unprovoked, and violent attack with a weapon calculated to inflict death or serious bodily injury was made upon him

by W. N. Erwin, the alleged injured party, in which serious bodily injury and great physical pain had been inflicted upon defendant, and that defendant was, at the time he is charged with the commission of the offense, under the immediate influence of sudden passion arising from said cause; and it was therefore incumbent upon said court to define manslaughter, and to submit the question to the jury as to whether the defendant may not have been guilty of only aggravated assault, because of his being under the immediate influence of sudden passion caused by said assault upon him.

It has been held in numerous decisions by the courts of last resort in this State, that where there is any evidence, however slight and unsatisfactory it may appear to the trial judge, tending to show that the defendant may be guilty of a lower grade of offense, it is the imperative duty of the court to present the law applicable to the lower grade; because to do otherwise, as was said by Judge Ector, in delivering the opinion of the court in the case of Robles v. The State, 5 Texas Criminal Appeals, 358, " would be for this court and the court below to decide doubtful facts, and the right of trial by jury would be practically gone."

In the case of Mackey v. The State, 13 Texas Criminal Appeals, 360, this court cites approvingly the case of Rex v. Hayward, cited by Mr. Wharton, as an excellent illustration of the question of cooling time. " In that case the defendant was at the house of deceased's mother, who desired the deceased to turn the prisoner out, and he did so, giving him a kick at the time, upon which the prisoner said he would make him remember it, and went home, about 300 yards, passed through his bedroom, to a kitchen adjoining, and into the pantry, where he kept a knife, and having got it, returned hastily and met the deceased coming towards him with his hat, when a conversation ensued, and they walked together; when the deceased giving the prisoner his hat, the prisoner swore he would have his rights, and stabbed the deceased in two places, saying, he had served him right. It was held, that the principal question to be submitted to the jury was, whether the wounds were given by the prisoner while smarting under the provocation so recent, and showing that he might be considered at the moment not master of his understanding, in which case he would be guilty of manslaughter only; or whether, after the provocation, there had been time for the blood to cool and reason to resume its sway before the wound was inflicted, in which case the offense would be murder."

In the case of Maher v. The People, 10 Michigan, 213, Judge Christiancy, in delivering the opinion of the court, says: " No precise time, therefore, in hours or minutes, can be laid down by the court as a rule of law within which the passion must be held to have subsided, and reason to have resumed its control, without setting at defiance the laws of man's nature, and ignoring the very principle on which provocation and pas-

sion are allowed to be shown in mitigation of the offense. The question is one of reasonable time, depending upon all the circumstances of the particular cases, and in a majority of cases is one peculiarly within the province of the jury to determine." And this decision is cited approvingly in the case of Eans v. The State, 10 Texas Criminal Appeals, 450. See also Spivey v. The State, 30 Texas Cr. App., 343; Baltrip v. The State, 30 Texas Cr. App., 545; Bracken v. The State, 29 Texas Cr. App., 367; Bonner v. The State, 29 Texas Cr. App., 230; Hawthorne v. The State, 28 Texas Cr. App., 212; Lienpo v. The State, 28 Texas Cr. App., 179; Cochran v. The State, 28 Texas Cr. App., 422; Orman v. The State, 24 Texas Cr. App., 495; Howard v. The State, 23 Texas Cr. App., 265; Orman v. The State, 22 Texas Cr. App., 604; Johnson v. The State, 22 Texas Cr. App., 221; Paulin v. The State, 21 Texas Cr. App., 436; Miles v. The State, 18 Texas Cr. App., 170; Hobbs v. The State, 16 Texas Cr. App., 517; Williams v. The State, 15 Texas Cr. App., 617; Rutherford v. The State, 15 Texas Cr. App., 236; Neyland v. The State, 13 Texas Cr. App., 549; West v. The State, 2 Texas Cr. App., 460.

2. The question often arises for a jury to determine whether the evidence tending to establish self-defense is sufficient for that purpose; or if not, then whether such evidence tending to establish self-defense, considered either alone or in connection with all of the other facts and circumstances in evidence, is sufficient to establish adequate cause. In some cases the evidence tending to establish self-defense may warrant a charge on self-defense alone, while in other cases the evidence tending to establish self-defense may be of such a character as that, considered either alone or in connection with the other facts and circumstances in evidence, may require a charge upon manslaughter. Williams v. The State, 15 Texas Cr. App., 617, and several of the other cases cited.

3. The defendant is entitled to the benefit of a charge presenting every phase of his defense, although based upon his evidence alone as a witness in his behalf. White v. The State, 30 Texas Cr. App., 652.

4. And he is also entitled to the benefit of this charge where there is evidence tending to reduce the offense to manslaughter, although it should appear from his own evidence as a witness that the case was either one of self-defense or murder. Bonner v. The State, 29 Texas Cr. App., 230.

In the case at bar we insist that the defendant had the right to have the law of manslaughter and aggravated assault, as applicable to this phase of the evidence, submitted to the jury in appropriate charges.

*R. L. Henry*, Assistant Attorney-General, for the State. — The only question in this case is, whether the court should have charged on manslaughter and aggravated assault. Appellant brought on the difficulty, and was the aggressor all the way through, until he made the assault. His attitude never changed. The court should not have so charged. Mil-

ler v. The State, 31 Texas Cr. Rep., 609; Willson's Crim. Stats., secs. 981–1023.

SIMKINS, JUDGE. — The theory upon which the court declined to charge on manslaughter was, that appellant provoked the contest with Erwin in the saloon, with the apparent. purpose of killing, or inflicting great or serious bodily injury upon him. If this were true, the fact that appellant got injured, and subsequently returned with his gun and shot Erwin, would not reduce his offense to manslaughter; but if such was not his purpose, and appellant formed the design to kill Erwin after he was struck down by him, then a different question is presented. Cunningham's case, 17 Texas Cr. App., 98.

It has been repeatedly held, that in the absence of exception to the charge, and on failure to request instructions, this court would not reverse, unless upon the whole record the error was calculated to injure the rights of the defendant. Cunningham's case, 17 Texas Cr. App., 99, Davis' case, 28 Texas Cr. App., 560.

The test in such cases is, whether the evidence requiring a charge upon a less degree of homicide is of such cogency that had the charge been given it would probably have influenced the finding of the jury. Woodring's case, just decided; Davis' case, supra; Maxwell's case, 31 Texas Cr. Rep., 142.

We think that the charge on manslaughter should have been given, not only because there was sufficient evidence requiring such a charge, but because the charge was specially requested and an exception taken to the refusal of the court to give the same.

The evidence shows, that the parties were related, and up to the difficulty were on the friendliest terms. Erwin had given no cause of complaint to appellant. It was his son that had turned appellant's horse loose, which was the origin of the trouble. He demanded that Erwin should whip his son, and Erwin says that he agreed to do so. The boy beginning to cry, appellant stated to him that he need not cry, that he would do him and his daddy. At this time appellant stood with a drawn knife in his hand, but made no effort to use it, and left on being ordered out, and was struck down with a chair by Erwin. This is the testimony of Erwin, the injured party. On cross-examination he said: "When defendant first came up to me *he commenced to talk in a friendly and quiet manner*, and I said, 'Dick, you are always a fool when you are drunk; you had better leave here.' * * * I do not know how bad I hurt defendant, but I hit him as hard as I could, and gave him pretty hard licks [with the chair]. I did not knock him down the first blow with the chair. The second blow knocked him off the gallery."

Although there were four or five men in the saloon, no one heard any cursing but the bartender, and heard no quarrelling, and saw no knife,

but heard the noise on the gallery. Appellant says that he told Erwin about the matter in a quiet and friendly manner, and Erwin got mad and excited, and cursing appellant, ordered him out of the store, and picking up a chair he struck appellant a powerful blow, as hard as he could, on the head, and ordered witness to leave there, and knocked witness down with it, greatly injuring his head and shoulders.

There seems to be but little contradiction as to the first difficulty. Both agree that appellant's complaint was made in a quiet and friendly manner, and while appellant had a knife in his hand, he neither threatened Erwin with it nor attempted to use it in any way, even when being struck by the chair. There is one witness, Otto Ebner, who did testify to threats made by appellant, the evening of the difficulty, against Erwin, but his testimony was impeached by even the State's witnesses. Under the above facts, it certainly became material for the jury to say when was the design to kill Erwin formed in appellant's mind. Was it before and at the time when he went into the saloon with his drawn knife? Or was it after and in consequence of the blows received by him? If so, had there been cooling time before he shot Erwin? That is to say, if after being beaten by Erwin, the design to kill was first formed in a mind incapable of cool reflection, and while under the immediate influence of such passion, appellant armed himself and attempted to kill Erwin, the homicide, if occurring, would not be greater than manslaughter, and a charge to that effect should have been given.

The judgment is reversed and cause remanded.

*Reversed and remanded.*

HURT, PRESIDING JUDGE, and DAVIDSON, JUDGE.—We concur in the conclusion reached by Judge SIMKINS, that the law of aggravated assault and battery was an issue in the case, and should have been submitted to the jury. But we can not agree to all the reasons and statements contained in the opinion. The opinion states, that "the only theory upon which the court below declined to submit manslaughter, and consequently aggravated assault and battery, was, that appellant provoked the conflict with Erwin in the saloon, with the intention and purpose of killing, or inflicting great bodily injury upon him which might reasonably result in his death."

While there is some evidence tending to present this theory, yet the court might have believed that appellant did not provoke the difficulty in the saloon with intent to kill, and still believe that manslaughter, and therefore aggravated assault and battery, was not in the case. Because, conceding that appellant did not provoke the difficulty in the saloon with intent to kill Erwin, and conceding to the fullest extent that the blows with the chair were of such a character as not only to be a provocation,

Vol. XXXII. Crim.—32

but that they may have produced such a passion as rendered the mind incapable of cool reflection, yet if when appellant shot Erwin he was not prompted by the passion, aggravated assault and battery would not be in the case, notwithstanding the great provocation. This view of the case is strongly supported by the testimony of the defendant, he being a witness. He testified, that he did not return to Erwin's for the purpose of shooting him or having a difficulty, but only to get his horse left there by him, and shot because he thought his life to be in danger from Erwin and friends. The court submitted self-defense on this testimony.

If what he states must control, though aggravated assault may be suggested by other evidence, the court was correct in not submitting aggravated assault and battery to the jury. We, however, believe it to be the duty of the court to submit to the jury each and every phase of the case suggested by the evidence, whether the theory be presented by the evidence of the State or defense, or by both.

The Reporter will give the facts.

*Reversed and remanded.*