HUBER v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   May 5, 1919.)

No. 3267.

**1. HOMICIDE** ⊜⟶112(2)—SELF-DEFENSE—PROVOCATION OF ATTACK.

If defendant, charged with homicide, was attacked in his own cabin by deceased, and forced back to his bunk, and thrown down upon it, and deceased choked him until he was "all in," or had reasonable ground to believe he was going to suffer great bodily harm, and that it was necessary to protect himself, he was justified in using all necessary means, even to the extent of killing deceased, though he, defendant, was wrong in throwing deceased's blankets out of the cabin and ordering him to get out, which started the difficulty.

**2. HOMICIDE** ⊜⟶300(7)—SELF-DEFENSE—INSTRUCTIONS.

In a prosecution for homicide, instructions that if there was a mutual combat, during which defendant voluntarily shot and killed deceased, the plea of self-defense was not available, and that a mutual combat is one into which both parties willingly enter, *held* erroneous, in view of the testimony, as misleading.

**3. HOMICIDE** ⊜⟶192—EVIDENCE—SELF-DEFENSE—AGGRESSION.

In a prosecution for homicide by shooting deceased, who attacked defendant after the latter had ordered deceased out of defendant's cabin after words had passed between them, evidence offered by defendant tending to show a state of ill feeling, which might have existed in the mind of deceased toward defendant during the next to the last month before the killing, *held* admissible on the issue of who was the aggressor in the difficulty.

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska; Chas. E. Bunnell, Judge.

Alois Huber was convicted of manslaughter, and he brings error. Reversed, with directions to grant new trial.

Louis K. Pratt, of Fairbanks, Alaska, and Herman Weinberger, of San Francisco, Cal., for plaintiff in error.

Annette Abbott Adams, U. S. Atty., and Frank M. Silva, Asst. U. S. Atty., both of San Francisco, Cal., and R. F. Roth, U. S. Atty., and Harry E. Pratt, Asst. U. S. Atty., both of Fairbanks, Alaska.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge.   To review a conviction of manslaughter for voluntarily killing Mat Schernthaner, Huber brought writ of error from the District Court for Alaska, Fourth Division, and in his assignments complains of certain instructions upon the law of justifiable and excusable homicide given to the jury by the trial court.   Huber located Discovery placer claim and in 1915 built a small cabin (about 13x15 feet) on the ground.   About March, 1915, he and Schernthaner entered into a written agreement to work the claim on a percentage basis with Schernthaner until December 31, 1917.   There seems to have been an understanding that Schernthaner could occupy the cabin with Huber.   The two men lived together and mined the ground profitably until September 3, 1917.   Huber's evidence is that upon that day, while

---

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the two were at work in a cut, he complained of the manner in which Schernthaner was cleaning up the bed rock. Schernthaner answered with an oath and said:

"I have an interest in this ground here. I will do just as I please. You have no business to give me any orders."

Huber replied that he was only asking him to take the dirt out clean. Nothing more was said, and they continued working until that evening, when Huber, Schernthaner, and a neighbor named Cribbee, were in the cabin talking upon general subjects. Cribbee started to leave, when Huber asked Schernthaner to show his copy of their agreement to Cribbee. Schernthaner declined, whereupon Huber showed his copy to Cribbee, in order to have Cribbee "act as a referee" as to whether Schernthaner had any possible claim to the title. Schernthaner then said that he had never claimed any interest in the ground, and that Huber had misunderstood him, whereupon Schernthaner called-ed Huber a liar, and accused him of having tried to make him (Schernthaner) lie about another matter at a previous time. Huber, who was then lying down on his bunk, got up and told Schernthaner that he must retract that charge or get out of the cabin. Schernthaner made some remark, whereupon Huber went over to Schernthaner's bunk on the other side of the cabin, took up some of the blankets, threw them out of the cabin, and was in the act of carrying a second pile of bedding to throw it out, when Schernthaner pushed Cribbee aside and grabbed Huber. We quote from Huber's testimony as to what next happened:

"Well, as near as I remember, it was around my left arm and here, and the other one he had under me, and he got me against the table first, and the table started to wobble over, and he got me against the bunk, and I had one arm—the blankets, I guess I dropped them—he had one of my hands pinioned; my left hand was pinioned, and with the right one I tried to hold him close to me. I had him around the neck with my right arm, and I tried to get his right arm. He had been hitting me several times against the ribs here. He pushed me against my bunk. He hit me several times with one fist, and with the other hand he finally got at my throat, this left hand; and I had one leg around -him, around his leg a ways, and in doing that either I kicked over the table or he pushed it over with his back, and it was dark for a minute or two, and I seen his fist coming again. His head and shoulder was where it was dark, but I could see the blow coming, and I catched it again, and he got me by the arm, and finally got me on the bunk. I let go with my foot, and he got me on the bunk, on my bunk. * * * And he got in one good blow, and he got me on the bunk. And I noticed he had both hands on my throat then. I had one hand under me on the bunk, and I was laying partly on the bunk with my left leg, and my right was mixed up against his still, against his body, and it was dark at that' moment. I reached back with my hand, and I got hold of this gun, and I made one jab at him. He was laying on top of me. He was choking me. My wind was shut off. As I say, when he got me by the gurgle, I grabbed this gun and makes one jab at him, or two jabs, and all at once I heard a noise, something like that, and he moved away from me. I felt his hands leave me and go back, and a little while later, as soon as he let me go, I was trying to get up, and just at that moment I seen him going through the door. * * * Q. What did you think when he was choking you there and you got your revolver—what did you think was going to happen to you? A. Well, I was scared for one thing, I guess. Q. What did you think about getting killed or badly hurt there—badly hurt? A. Well, I don't know as

I was thinking anything, except I was all in. I know that. * * * The time he had me on the bunk with both his hands on my throat I was all in. I know that I got hold of this gun, and I made this one jab at him, or two jabs, and the second time I noticed by hand was caught somehow, and at the same time I heard this noise. I heard just a faint report. I have just a recollection. Q. At that time where was he standing? A. He was lying on top of me, standing over the top of me. I felt his hands leave me just when that— (Interrupted:) Q. And before that? A. It was on my throat. * * * Q. At that time you were all in, were you? A. Yes. Q.. When did you commence to feel that weakness—was it before you got down on the bunk, or after you got down? A. No; I felt pretty weak when he got that second or third jolt in my ribs. * * *"

On cross-examination Huber said that he was afraid of Schern-thaner, but that he did not think there was going to be a fight; that by throwing out his blankets he would be indirectly putting him out of the house; that he had the blankets in his hand when Schernthaner grabbed him, and that he then dropped the blankets; that he did not want to strike Schernthaner, or to choke him, as he wasn't looking for a fight; "all my object was to see him get out of there was all." He said he tried to catch Schernthaner's right arm and hold him, but that when he got down on the bunk Schernthaner got hold of his throat. He was asked how he was able to reach over between the pillow and the head of the bunk and get hold of his revolver, to which he replied that he was able to move his arm at that time, and got the arm free and "grabbed the gun to defend myself the way I could"; that he had put the revolver at the head of his bed, and remembered reaching back to get it in order to strike Schernthaner with something; that he did strike him at the time Schernthaner had him by the throat, and "when that shot went off I heard a noise something like that"; that he never invited Schernthaner out to fight with him at any time.

The evidence is that Huber was 40 years old, and suffered more or less from two ruptures, and that Schernthaner knew of the rup-tures, because he had talked to Huber about them. The deceased was a young man in good health and a little heavier than Huber.

Cribbee, the only witness of the occurrences in the cabin, testified substantially: That he had examined the agreement heretofore refer-red to, and that he told Schernthaner that it did not disclose anything more than a mere working interest in the property; that then Schern-thaner accused Huber of trying to make him lie about some work pre-viously done, whereupon Huber called Schernthaner a liar; that Huber took the first pile of blankets and, after throwing them toward the door, took up another pile; that he thought Schernthaner said he would not get out; that deceased got up and brushed by him, and "they clinched right in here"; that he could not see which grabbed the other first because, when Schernthaner brushed past him, witness got up and got out of the way and walked toward the stove; that when he saw the men together they were on the bunk, Schernthaner on top of Huber; that somebody kicked the little bench over against the table and knocked off the lamp; that witness caught it, but it had not gone out entirely; that he thought the conflict lasted about two minutes; that he saw "hands working," but could not see the men distinctly, and heard the report; that then the deceased passed by him, holding his

hands over his breast, and said he was hit; that he went outside the door and found that Schernthaner was dead; that he saw finger marks upon the throat of the defendant.

In charging the jury the court read the statute of Alaska which makes homicide justifiable when committed "to prevent the commission of a felony upon the property of such person or upon property in his possession, or upon or in any dwelling house where such person may be" (Comp. Laws Alaska 1913, § 1892), and makes homicide excusable when committed "by accident or misfortune in lawfully correcting a child, or in doing any other lawful act, by lawful means, with usual and ordinary caution and without any unlawful intent, or by accident or misfortune in the heat of passion, upon a sudden and sufficient provocation, or upon a sudden combat, without premeditation or undue advantage being taken, and without any dangerous weapon or thing being used, and not done in a cruel or unusual manner" (section 1893). Continuing, the court said:

"In the next instruction I will use the term 'mutual combat,' and I will now define it to you. A mutual combat is one in which both parties enter willingly. * * * If you find from the evidence in this case beyond a reasonable doubt that there was a mutual combat between the defendant and the deceased, during which the defendant voluntarily shot and killed the deceased, then the plea of self-defense is not available to the defendant. * * * The court instructs the jury that, where a person is unlawfully attacked by another at any place where he has a right to be, he is not required to retreat, but may stand his ground and defend himself, and continue such defense until he is entirely out of danger. So, also, the person attacked may safely act on the appearances of the situation as they appear to him at the time of the encounter, provided he acts as a reasonable man under the circumstances surrounding him, and if from such appearances he honestly believes that he is then and there about to suffer death or great bodily harm at the hands of his assailant he may lawfully take the life of such assailant in self-defense. In this connection it is the right and duty of the jury, in their deliberation upon the evidence, to put themselves as nearly as possible in the shoes of the defendant, and from his standpoint determine the question as to whether the appearances to the defendant were such as to cause him to honestly believe, acting as a reasonable man, that he was then and there about to be killed or suffer great bodily harm at the hands of the deceased.

"Applying the foregoing principles of law to the evidence in this case, if you find it to be true, or entertain a reasonable doubt whether or not it is true, that at the time and place stated in the indictment the deceased, Mathias Schernthaner, assaulted and struck the defendant in his cabin, and continued the assault to such an extent that the defendant, honestly believing, from the appearances then present and known to him, that he was then and there about to suffer death or great bodily harm at the hands of deceased, picked up his revolver, which was lying at the head of his bunk, and voluntarily discharged the same against the body of Schernthaner, causing his death, then defendant had a lawful right to defend himself with said revolver, and if in doing so the said Mathias Schernthaner met his death, it was justifiable homicide in self-defense, and you should find the defendant not guilty; and this same result follows, notwithstanding you may now believe from the evidence heard at the trial that the defendant was misled by such appearances, and was in no actual danger of losing his life or suffering great bodily harm at the hands of deceased. The age and relative size, strength, and physical prowess of both the defendant and deceased should also be taken into consideration by the jury."

[1] While we think that Schernthaner was justified in believing he had a right to stay there during his term of his leasing agreement, it is perfectly plain that Huber was in his own cabin and had a right to remain there. If the defendant was telling the truth, Schernthaner was the aggressor in the actual physical fight, and if defendant was forced back to his bunk and thrown down upon it, and deceased was on top of him and choking him, and he really was "all in," as he expressed it, or had reasonable ground to believe he was going to suffer great bodily harm at the hands of the deceased, and that it was necessary to protect himself, the law would justify Huber in using all means necessary to defend himself, even to the extent, if reasonably necessary, of killing his assailant; and this would be true, notwithstanding the fact that Huber was wrong in throwing out Schernthaner's blankets and ordering him to get out of the cabin.

[2] Certain instructions which were given show that the court expressed substantially these views just outlined upon the law of self-defense. But we think that the jury might well have been misled by the previously given instructions that if there was a mutual combat, during which defendant voluntarily shot and killed Schernthaner, the plea of self-defense was not available, and that a mutual combat is one in which both parties willingly enter. It is to be remembered that Huber testified that he did not want or mean to bring on a fight and that his only purpose in throwing out the blankets was indirectly to put deceased out of the cabin. Granting always that Huber's conduct was wrong, still, according to his evidence, he had no intent to do Schernthaner any physical harm whatever, and under the testimony, when he threw the blankets out, he had no weapon upon his person, and made no threat of doing bodily injury to Schernthaner, and made no advance toward fighting. Under the circumstances, if Schernthaner, angered by the conduct of Huber, made a quick and felonious attack upon him, and Huber stood his ground where he rightfully was, and was willing to fight with him, but had no intention of doing him serious bodily harm, and Schernthaner continued his felonious assault, and backed him over to the bunk and got on top of him with intent to kill or to choke and injure him, and was in the act of doing him great harm, and Huber believed he was in danger of being killed or grievously hurt, and that to protect himself it was necessary for him to shoot his assailant, then we believe that he could avail himself of the plea of self-defense.

We do not mean to express an opinion upon the weight of the evidence, but under the testimony we think the court should not have charged that, if Huber willingly engaged in combat, the plea of self-defense was not available. In Gill v. State, 134 Tenn. 591, 184 S. W. 864, the defendant was convicted of voluntary manslaughter. The court charged the jury as follows:

"When one man invites another to combat, and the other accepts the invitation, and they both willfully engage in a mutual combat, and one of them slays the other in such combat, he cannot successfully invoke the law of self-defense, but would be guilty of at least voluntary manslaughter."

The Supreme Court of the state said:

"The instruction in its effect, applied to the facts, holds that if one willingly entered into a mutual combat with another, without any intent to do great bodily harm, and thereupon his adversary resorted to a deadly weapon and was about to assault him therewith, he would not have the right to defend himself or resort to such a weapon in his necessary self-defense. Such is not the law."

Irvine v. State, 104 Tenn. 132, 56 S. W. 845, Daniel v. State, 10 Lea (Tenn.) 262, and other cases are cited. See, also, Rowe v. United States, 164 U. S. 546, 17 Sup. Ct. 172, 41 L. Ed. 547; Sowell v. State, 32 Tex. Cr. R. 482, 24 S. W. 504; People v. Hecker, 109 Cal. 451, 42 Pac. 307, 30 L. R. A. 403; State v. Berkley, 92 Mo. 41, 4 S. W. 24; State v. Doris, 51 Or. 136, 94 Pac. 44, 16 L. R. A. (N. S.) 660; Foutch v. State, 95 Tenn. 711, 34 S. W. 423, 45 L. R. A. 687.

In the last case cited there was a dispute as to who precipitated the conflict. The defendant contended that he did not bring about the trouble, and that he acted in self-defense, but that, if he were the aggressor, nevertheless he could not be precluded from relying upon the plea of self-defense, inasmuch as the deceased threatened him with such acts of violence as to imperil his life or to threaten him with great bodily harm, and that it was therefore justifiable in him to shoot in self-defense. The court said:

"It is true that such statements are to be found in many books; that if one be the 'aggressor,' or be 'in fault,' or 'provoke a difficulty,' he cannot rely upon the plea of self-defense. But such general statements are only true when taken in the limited sense in which they must be understood, and with the qualifications with which judicial utterances that gave them existence have guarded their application. In order to make a man guilty of murder, who is the 'aggressor,' or 'in fault,' or who 'provokes a difficulty' in which his adversary is killed, he must have provoked it with the intent to kill his adversary or to do him great bodily harm, or to afford him a pretext for wreaking his malice upon his adversary. * * * In order to deny to such party the right to rely on the plea of self-defense, it must appear that he was the 'aggressor,' or 'in fault,' or 'provoked the difficulty' in such way and with such intent as the law contemplates in the use of these terms. It is not every 'aggression' which produces a difficulty that is an unlawful one, within the meaning of this phrase, nor is it every 'fault' which a man might commit that precludes him from defending himself when violently assaulted or menaced, nor is it every 'provocation of a difficulty' which robs him of the right of self-defense."

The instruction heretofore quoted was misleading, for without qualification it deprived the defendant of the benefit of a defense which became vitally important.

[3] When the cause comes on for trial again we think that the court might properly admit the evidence which the defendant offered upon the last trial tending to show a state of ill feeling which may have existed in the mind of the deceased toward the defendant during July preceding the killing. It would serve to aid the jury in arriving at the truth of the material point as to who was the aggressor at the time of the affray in the cabin just before the killing occurred.

The judgment is reversed, with directions to the District Court to grant the defendant a new trial.