******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
LATASHA R. O'BRYAN
(SC 19336)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued December 2, 2014—officially released September 15, 2015*

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Laura DeLeo*, assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. This appeal presents numerous issues concerning the self-defense statute, General Statutes § 53a-19,[1] and particularly the combat by agreement disqualification under § 53a-19 (c) (3). The defendant, Latasha R. O'Bryan, appeals[2] from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1). On appeal, the defendant claims that the trial court improperly instructed the jury that: (1) with respect to the subjective portion of the self-defense analysis, the defendant was required to have an "honest" or "sincere" belief that physical force was going to be used against her; (2) she was required to demonstrate that she had actual knowledge, rather than merely a reasonable belief, that the victim had violated the terms of their combat by agreement; and (3) the defendant retained the burden of proof once the state asserted a theory of combat by agreement. The state disagrees, and posits, as an alternative ground for affirmance, that the defendant was not harmed by any of the claimed improprieties in the jury instruction because any defendant who is a party to combat by agreement is completely disqualified from relying on the justification of self-defense, even if the other combatant escalated the violence beyond the terms of the agreement. We conclude that the trial court properly instructed the jury. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found,[3] and procedural history. The defendant and the victim, Lawanda McCrea, lived in different units within the same apartment building in New Haven. The defendant and the victim had previously been friendly but, in the months leading up to the Memorial Day weekend of 2010, their relationship had deteriorated significantly.[4] The friction between them had become so great that the defendant had complained twice to their landlord, Merwin Wade, about the victim, saying that "if she keeps messing with me, [I'm going to] beat the shit out of her," and that "it's getting out of hand now . . . and if she keep[s] bothering me, I'm [going to] whup her butt."

After midnight on May 30, 2010, the victim and her cousin, Whitney Nichols, left a cookout and drove to the apartment building. Upon arriving at her building, the victim saw several people on the porch, including the defendant, who had just returned home from a double shift at her job as a nurse's aide. Given the animosity between them, the victim was concerned that the defendant would start a fight with her. Rather than park their vehicle, the victim and Nichols pulled away and stopped around the corner from the building. The victim then called her uncle, William Murdock, and asked him to

help her get into her apartment safely because she was worried that she might be "jumped" by the defendant and the others on the porch. If there was going to be a fight, the victim testified, she did not want anyone assisting the defendant.

A few minutes later, Murdock and Wanda Atkins, the victim's aunt, arrived to accompany the victim into her apartment. The victim and her family members then exited their vehicles and began walking up to the building. Murdock was angry that his niece felt threatened and had a heated exchange with the people gathered on the porch. David Kennedy, another building resident, came outside when he heard the raised voices and, after speaking with Murdock, returned inside to wake up Wade. Murdock, who the defendant testified appeared intoxicated, then argued with the defendant, and then the defendant and the victim exchanged words, raising their voices and cursing at each other.[5] The defendant told the victim that she wanted a "fair one."[6] As the victim testified, "[the defendant] and I both wanted to fight each other." Because the victim was wearing a sundress and sandals, she went up to her apartment to change into "appropriate fighting attire."

Meanwhile, Wade, having been apprised of the developing situation by Kennedy, went outside and directed everyone who did not live in the building to get off the porch. As the victim returned downstairs, she met Wade and explained to him what was happening. Wade told the victim to "just leave it alone" because he did not want any fighting to take place.

Notwithstanding Wade's instructions, the victim went out to the porch at the same time that the defendant returned with her cousin, Tiny Lester. The victim said to the defendant, "you want your fair one," and then walked to meet the defendant on the sidewalk. The defendant approached the victim and reiterated that she "want[ed] [her] fair one." The defendant raised her fists in a fighting stance and the victim did the same. The victim testified that she had no weapons with her, although the defendant provided a different account, stating that she saw the victim with a lime green colored sharp object just as the fight started.

The defendant swung first with her right hand, striking the victim with a small steak knife that she carried for both work and self-defense purposes, and the victim swung back with her right hand, while her left hand was up in a defensive position. The victim never hit the defendant because she heard Wade start to scream. The victim looked down and realized she had blood on her left hand and yelled, "I'm cut." Atkins started screaming that she had seen the blade and that she was calling 911. The defendant denied having cut the victim, yelling that the victim must have cut herself or that maybe her fingernails cut the victim.[7] At that point, the fight ended and the victim returned to the building.

As she was walking up to her apartment, the victim realized that her shirt and entire right breast area were soaked in blood. Murdock drove her to the hospital, where she received treatment for a chest wound four centimeters long and nine to ten centimeters deep. The defendant was arrested, but the knife was never recovered.[8]

The state charged the defendant with assault in the second degree in violation of § 53a-60 (a) (2), and attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1). The case was tried to a jury, which rejected the defendant's claim of self-defense and found her guilty on all counts. The trial court subsequently rendered a judgment of conviction in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of five years imprisonment. This appeal followed.

On appeal, the defendant raises numerous challenges to the trial court's jury instructions on both self-defense generally, and combat by agreement specifically. The state concedes that the defendant's instructional claims, although unpreserved, are reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because they were not waived and "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Clark*, 264 Conn. 723, 729, 826 A.2d 128 (2003). Thus, in considering the defendant's instructional claims, we note that the well established "test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Lavigne*, 307 Conn. 592, 599–600, 57 A.3d 332 (2012).

I

We first consider the defendant's claim that the trial court incorrectly charged the jury on the subjective portion of the subjective-objective test for determining entitlement to self-defense. Specifically, the defendant contends that the court incorrectly required that she have an "honest" or "sincere" belief that physical force was going to be used against her.[9] Relying primarily on

*United States* v. *Hardin*, 443 F.2d 735 (D.C. Cir. 1970), the defendant contends that this language is confusing because it imports a good faith requirement that goes beyond the "actual belief" required by the subjective portion of the self-defense analysis. In response, the state relies on, inter alia, *State* v. *Prioleau*, 235 Conn. 274, 664 A.2d 743 (1995), and *State* v. *Clark*, supra, 264 Conn. 723, and contends that the use of the terms "honest" and "sincere" is well established in our case law and pattern instructions because they are "synonyms of the term 'actual.'" We agree with the state, and conclude that the trial court's instructions were an accurate statement of the law of self-defense that could not have misled the jury.

We begin with a "brief review of the law of self-defense. Under our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. . . . Whereas an affirmative defense requires the defendant to establish his claim by a preponderance of the evidence, a properly raised defense places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. . . . Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt. . . . Accordingly, [u]pon a valid claim of self-defense, a defendant is entitled to proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . As these principles indicate, therefore, only the state has a burden of persuasion regarding a self-defense claim: it must disprove the claim beyond a reasonable doubt.

"It is well settled that under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . .

"The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires

that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19."[10] (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 264 Conn. 730–32.

We conclude that the jury instructions' use of the terms "honest" and "sincere" to describe the nature of the subjective belief required by the defendant are an accurate statement of the law that are not likely to mislead jurors. As the state accurately notes, the well established usage of these terms in our case law is consistent with the requirement that the "defendant in fact . . . believed that the use of deadly force was necessary," before determining "whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 264 Conn. 732; see also, e.g., *State* v. *Saunders*, 267 Conn. 363, 373–74, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004); *State* v. *Lemoine*, 256 Conn. 193, 207, 770 A.2d 491 (2001); *State* v. *Prioleau*, supra, 235 Conn. 286–87.

The common usages of the word "actual," "honest," and "sincere" in this context are consistent with the subjective aspect of the subjective-objective test precluding the use of self-defense as a post hoc rationalization for otherwise criminal conduct. See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining "actual" as "existing in fact or reality," defining "honest" as "legitimate, truthful" or "genuine, real," and defining "sincere" as "honest" or "true"). Indeed, even assuming that "the word actual would be preferred to the use of the word honest" as a matter of draftsmanship, the use of the word honest "did not impose some higher standard of belief in this case, but only required a finding that the appellant really believed that he was in immediate danger. This is a fair statement of the law of self-defense." *United States* v. *Hardin*, supra, 443

F.2d 739. Accordingly, we conclude that the jury instructions on this point were an accurate statement of the law that did not mislead the jury.

## II

We next turn to the parties' various claims with respect to the combat by agreement disqualification to the justification of self-defense under § 53a-19 (c) (3), which require us to determine whether: (1) a defendant is completely disqualified from claiming self-defense after the state proves combat by agreement, even if the victim had violated the agreement's terms by escalating the use of force beyond what was originally agreed upon; (2) the trial court improperly charged the jury that the defendant was required to "actually know," rather than "actually and reasonably believe," that the victim had escalated the fistfight from the "mere use of physical force to actual use or imminent use of deadly force"; and (3) the trial court's instructions properly reflected the applicable burden of proof.[11]

## A

We begin with the state's alternative ground for affirmance, which responds to the defendant's challenges to the jury instructions on § 53a-19 (c) (3) by arguing that a finding of illegal combat by agreement completely disqualifies a defendant from claiming that his conduct was justified because he acted in self-defense. Specifically, the state argues that any instructional error "could not have harmed the defendant because it was beneficial to her. Because our statute makes clear that there is no exception to the combat by agreement disqualifier, upon the jury's finding of a combat by agreement, self-defense becomes inapplicable," despite the fact that the victim may have "violated the terms of the agreement and escalated the level of force beyond what the two had agreed upon . . . ." In response, the defendant cites, for example, *Huber* v. *United States*, 259 F. 766 (9th Cir. 1919), and *Grant* v. *State*, 120 Ga. App. 244, 170 S.E.2d 55 (1969), and contends, inter alia, that the state's argument misstates the law of combat by agreement because it is well established at common law that the requisite agreement must be for mutual combat on "equal terms." (Internal quotation marks omitted.) We agree with the defendant's reading of § 53a-19 (c) (3), and conclude that the trial court's jury instructions on the topic of combat by agreement properly reflected the common-law principle that the requisite agreement does not exist when one party unilaterally and dangerously escalates the previously equal terms of a fight.

Because this issue presents a question of statutory interpretation, which "is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words,

we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . .'' (Internal quotation marks omitted.) *State* v. *Buckland*, 313 Conn. 205, 224, 96 A.3d 1163 (2014), cert. denied,    U.S.   , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015).

We conclude at the outset that § 53a-19 (c) (3) is ambiguous, thus permitting resort to extratextual evidence in accordance with § 1-2z. Specifically, the state's reading of the language of § 53a-19 (c) (3) is reasonable—at least facially—insofar as there is a plausible policy reason for denying those who enter into fights a right to claim self-defense. We also, however, find reasonable the defendant's reading of the statute, which would permit the use of reasonable force in self-defense when a fight escalates beyond a previously agreed-upon level, because that interpretation relies upon the term "agreement" as embodying some mutual consent to the level of force involved in the encounter. Moreover, the state's facially plausible reading of the statute has the bizarre result of privileging an initial aggressor with some right of self-defense under subdivision (2) of subsection (c), while depriving the mutual combatant under subdivision (3) of subsection (c) of *any* right of self-defense—even when his opponent brings a gun to an agreed upon fistfight. Accordingly, we look beyond the text of the statute.

We begin by reviewing some background principles concerning combat by agreement under Connecticut law. Combat by agreement, often referred to as "mutual combat," is an exception that operates as a statutory disqualification from the justification defense of self-defense. "A jury instruction regarding the combat by agreement exception to self-defense is warranted when the evidence is sufficient to support a reasonable inference that such a mutual combat occurred." (Internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 747, 894 A.2d 928 (2006). "The agreement required by . . . § 53a-19 (c) (3) need not be formal or express."

*State* v. *Silveira*, 198 Conn. 454, 471, 503 A.2d 599 (1986). Such an agreement may be tacit and inferred from the facts and circumstances of the case. See *State* v. *Montanez*, supra, 747–48 (sufficient evidence to warrant combat by agreement instruction when friend urged one brother to fight with defendant, who returned with his brother and challenged defendant's friend to fight "man-to-man"); *State* v. *Silveira*, supra, 471 (sufficient evidence to warrant combat by agreement instruction when defendant and his friends had gone to bar "to assist friends who they had heard were in trouble," then "became embroiled in an altercation" with another person, who "entered the bar and returned shortly with companions of his own," who "converge[d] on the defendant's group, with the resulting acceleration of hostilities"); *State* v. *Johnson*, 53 Conn. App. 476, 481–82, 733 A.2d 852 (sufficient evidence to justify instruction on combat by agreement when victim and defendant "argued, displayed their weapons, walked to the middle of the street armed and angry and confronted each other" before "defendant fired three shots that killed the victim"), cert. denied, 249 Conn. 929, 733 A.2d 849 (1999).

Our cases have not, however, considered the requisite mutuality of the terms of the combat by agreement, or, put differently, the legal effect of an altercation escalating beyond its apparently agreed upon terms. Stated another way, the question arising in the present case is whether combat by agreement exists, as a matter of law, when the parties to an altercation purport to agree to a fair fistfight, and one party breaches that agreement by, for example, introducing a deadly weapon. In addressing this lacuna,[12] we note that although our Penal Code lacks specific commentary on this point, the drafters of § 53a-19 emphasized that the justification defenses generally "attempt to restate the common law." Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments (1972) p. 7. Indeed, this court has previously noted that "[t]he statutes which enumerate the situations where the use of force is justified" should " 'be read in the light of their common law background, and the fact that an individual section does not fully state the relevant common law rule, with all [of] its possible applications, exceptions, or implications, should not prevent a court from reading it as incorporating the full body of common law rules relevant thereto.' "[13] *State* v. *Terwilliger*, 314 Conn. 618, 654, 104 A.3d 638 (2014), quoting Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments, supra, p. 7. Our review of sister jurisdictions' case law and scholarly commentary on this topic demonstrates that the state's interpretation of § 53a-19 (c) (3) contravenes the drafters' expressed intent because it is wholly inconsistent with the common-law principles that underlie the statute.[14]

As with contracts generally, the common-law analyti-

cal key to combat by agreement is mutual consent. As Professor Paul Robinson notes in his landmark treatise, statutory provisions that "deny a defensive force justification to both parties engaged in unauthorized mutual combat" are "analogous" to those under which "the threatened harm not be consented to by the actor."[15] 2 P. Robinson, Criminal Law Defenses (1984) § 132, p. 98. Professor Robinson describes mutual combat provisions as a "response to the evidentiary problems of determining who the initial aggressor was in such cases, a fact that can, in some jurisdictions, determine which participant will be given a defense." Id. He describes such provisions as potentially "unnecessary," insofar as actors engaged in "mutual combat both are employing aggressive, rather than defensive force, and neither actor's conduct is necessary to his defense and is, for that reason, unjustified." Id., pp. 98–99. This suggests then, that there simply is no agreement to engage in mutual combat when one party escalates the fight beyond that which the parties had contemplated.

Consistent with Professor Robinson's view of combat by agreement, we agree with the South Carolina Supreme Court that combat by agreement exists only when there is a "mutual agreement to fight *on equal terms* for purposes other than protection," because that equality "is inherently inconsistent with the concept of self-defense, and directly conflicts with the 'no fault' finding necessary to establish self-defense." (Emphasis added.) *State* v. *Taylor*, 356 S.C. 227, 234, 589 S.E.2d 1 (2003). Thus, the court held that there was insufficient evidence to justify a mutual combat charge when there was, in addition to no evidence of "pre-existing ill-will or dispute" between the victim and the defendant, also no evidence that the parties knew that each other were armed. Id. Similarly, the Georgia courts have held that "[m]utual combat usually arises when the parties are armed with deadly weapons and mutually agree or intend to fight with them. Mutual combat does not mean a mere [fistfight] or scuffle." *Grant* v. *State*, supra, 120 Ga. App. 244; see also *Huber* v. *United States*, supra, 259 F. 771 (improper to instruct jury that "if one willingly entered into a mutual combat with another, without any intent to do great bodily harm, and thereupon his adversary resorted to a deadly weapon and was about to assault him therewith, he would not have the right to defend himself or resort to such a weapon in his necessary self-defense" [internal quotation marks omitted]); *Eckhardt* v. *People*, 126 Colo. 18, 25, 247 P.2d 673 (1952) ("Ordinarily the defense of self-defense in strictly mutual combat is not allowable, but a limitation on the right of self-defense does not arise alone from the fact that the two parties here were mutually engaged in a fistfight. An agreement to combat and finish their troubles must exist and must be in the nature of an antecedent agreement to so fight."); *Flowers* v. *State*, 146 Ga. App. 692, 247 S.E.2d 217 (1978) (improper to charge on

mutual combat when evidence was that defendant and victim "had been engaged in a game they called 'mercy'; the game was a simple showdown of strength where each man tried to out-grip the other's hand," which devolved into fistfight and ultimately guns were produced, insofar as "there is no evidence showing that these men agreed to fight with weapons"); accord *State* v. *Crisantos*, 102 N.J. 265, 274, 508 A.2d 167 (1986) (noting that mutual combat, for purposes of reducing murder to manslaughter at common law, requires that "the contest must have been waged on equal terms and no unfair advantage taken of the deceased" [internal quotation marks omitted]).

In light of the persuasive logic of these authorities, we conclude that the combat by agreement disqualification under § 53a-19 (c) (3) did not preclude the defendant from relying on the justification of self-defense as a matter of law. In our view, the state's arguments to the contrary foster the illogical and dangerous result of depriving a participant in a supposedly fair fistfight of the right to self-defense when his or her opponent shows up with a deadly weapon, an unexpected gang of supporters, or an unexpected gang of supporters wielding deadly weapons. In contrast, we view the instruction given by the trial court as consistent with the well established common-law principle requiring mutual consent as to the terms of engagement, notwithstanding the fact that those terms might lack the acceptance and pedigree of those sponsored by the Ninth Marquess of Queensbury.[16] Put differently, an escalation in the encounter beyond a fistfight meant that there was, in essence, no agreement at all. Accordingly, we disagree with the state's argument that the defendant's intention to have a "fair one" with the victim, without weapons or other friends participating,[17] constituted combat by agreement that disqualified her as a matter of law pursuant to § 53a-19 (c) (3) from claiming self-defense in the instance the fight escalated beyond the agreed upon terms.[18]

B

We now turn to the defendant's first challenge to the portion of the jury instruction charging the jury on combat by agreement, namely, that the trial court improperly charged that the defendant was required to "actually know," rather than "actually and reasonably believe," that the victim had escalated the fistfight from the "mere use of physical force to actual use or imminent use of deadly force . . . ." The defendant contends that this instruction was improper because a defendant is required only to have a "reasonable belief" that the other party escalated the confrontation, rather than actual knowledge, and argues that *State* v. *Abraham*, 84 Conn. App. 551, 557–58, 854 A.2d 89, cert. denied, 271 Conn. 938, 861 A.2d 514 (2004), which the Criminal Jury Instructions Committee cited as authority

for that pattern charge, does not support that portion of the instruction. In response, the state argues, inter alia, that under *State* v. *Silveira*, supra, 198 Conn. 454, "the self-defense disqualifiers in § 53a-19 (c) are [not] assessed from the defendant's perspective and his reasonable beliefs." We agree with the state, and conclude that the jury instructions did not misstate the law governing combat by agreement.

In *Silveira*, this court concluded that the proviso in § 53a-19 (a) makes "subsection (a) expressly subject to subsections (b) and (c)," meaning that the legislature made plain and unambiguous "its intent that the use of force in self-defense or defense of another, as provided in subsection (a), is not justified where a defendant has engaged in the conduct described in subsection (c). The issue under subsection (c) is not whether the defendant reasonably believed that he provoked the use of force, or that he was the initial aggressor, or that there existed an agreement to engage in combat. *The issue, rather, is whether the defendant did provoke the use of force, or was the initial aggressor, or did agree to engage in combat.* The trial court did not err in refusing to instruct that the exceptions of provocation, aggression and combat by agreement must be considered from the perspective of the defendant." (Emphasis altered.) *State* v. *Silveira*, supra, 198 Conn. 470; see also id., 469 ("by the terms of the statute, the use of force in self-defense or defense of another is never justified where the conditions set forth in subsection [c] [of § 53a-19] are found to exist").

We conclude that the trial court's instruction, requiring the defendant to "[know] of such a violation" of the terms of the mutual combat agreement, is a correct statement of the law. Although the defendant accurately observes that the pattern instruction on which it was based is not doctrinally supported by *State* v. *Abraham*, supra, 84 Conn. App. 558; see also footnote 12 of this opinion; the charge nevertheless is consistent with *State* v. *Silveira*, supra, 198 Conn. 470, which requires the jury to decide what actually happened, rather than what the defendant reasonably might have perceived what happened. Second, it is consistent with the overarching subjective-objective standard by which self-defense claims are determined, under which objective reasonableness is considered only if the defendant himself perceived the need for self-defense at the time of the altercation. See, e.g., *State* v. *Clark*, supra, 264 Conn. 730–32. Accordingly, we conclude that the trial court's instruction on this point did not misstate the law of self-defense.

C

Finally, we turn to the defendant's claim that the jury instructions did not place the correct burden of proof on the state with respect to the proof of the statutory disqualifier of combat by agreement, in particular by

(1) shifting the burden of proof to the defense, and (2) failing to direct the jury that the state retained the burden of disproving self-defense or proving combat by agreement by a reasonable doubt.[19] In response, the state contends that read in their entirety, the trial court's jury instructions properly informed the jury of the state's burden of proof. We agree with the state, and conclude that the trial court's self-defense charge did not misstate the burden of proof.

Viewing the charge in its entirety, as we must; see, e.g., *State* v. *Lavigne*, supra, 307 Conn. 599–600; we conclude that the instructions properly stated the burden of proof, both as to self-defense generally and with respect to the combat by agreement statutory disqualifier specifically. The trial court repeatedly reminded the jury that: (1) the state bore the burden of disproving self-defense beyond a reasonable doubt as a general matter; (2) the state bore the burden of proving the statutory disqualifiers, including combat by agreement and retreat; and (3) the defendant had no burden of proof at all. Contrary to the defendant's arguments, we conclude that the jury charge properly articulated the state's burden of proof with respect to self-defense generally, and combat by agreement specifically. See, e.g., *State* v. *Clark*, supra, 264 Conn. 730–31.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER, ZARELLA, EVELEIGH and McDONALD, Js., concurred.

[1] General Statutes § 53a-19 provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . .

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

Although this statute has been amended by our legislature since the events giving rise to this appeal; see Public Acts 2010, No. 10-36, § 15; that amendment has no bearing on the merits of the present case. Accordingly, for the sake of simplicity, we refer to the current revision of the statute.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court. Thereafter, we granted the defendant's motion to transfer the appeal to this court in accordance with General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] At trial, the defendant and the state presented two different versions of

the events that led to this appeal. The defendant claimed that the victim, without provocation, simply attacked her and that she had reacted in self-defense. The state, however, contended that the defendant and the victim had engaged in an illegal combat by agreement. To provide greater context for what the jury was required to determine at trial, evidence in support of the defendant's version of events is set forth in the footnotes of this opinion.

[4] The defendant testified that she had helped the victim by doing things such as giving her food and driving her places. The victim, however, had been saying negative things about the defendant and the defendant knew that the victim had a reputation for violence. In the period leading up to the Memorial Day weekend of 2010, the defendant had stopped associating with the victim.

[5] The defendant testified that after Kennedy came outside and other people came downstairs from the victim's apartment, James Turner, another resident, advised the defendant to leave, saying it was not safe for her to stay there. The defendant further testified that the victim and her family had blocked the entrance to the building so the defendant could not get to her apartment. The defendant was scared and Murdock's aggression toward her caused her to have flashbacks to physical abuse she had suffered at the hands of her former husband. She left and walked around the corner to the home of her cousin, Tiny Lester, where she explained to Lester what was happening.

Lester then offered to help the defendant get into her apartment because the defendant's children and goddaughter were there, and the defendant feared for their safety. Because Lester knew the victim's family, the defendant hoped that Lester would be able to calm them down and that she would be able to get into her apartment safely. Lester and the defendant walked back to the defendant's building.

When they arrived in front of the building, Lester and the defendant stopped outside the gate in front, and Lester said, "she don't got time for this; let her go upstairs; there's kids in this house; let her go upstairs; she don't got time for this." The altercation between the victim and the defendant happened shortly thereafter.

[6] Testimony offered at trial by some of the state's witnesses established that the defendant and the victim understood a "fair one" to be a fair fight between the parties involved in the dispute, involving only those two people and with no assistance from other individuals and no weapons—just fists and feet.

[7] More specifically, the defendant testified that one of the victim's cousins had handed a lime green object to the victim. The victim then said that she was going to attack the defendant, and charged toward her.

The defendant testified that, as the victim approached, the defendant realized that the lime green object in the victim's hand was sharp, and raised her hands up to cover her face. The defendant then drew the small, two inch steak knife in self-defense. The defendant testified that the victim swung first, slashing downward at the defendant with the lime green object, but missing because the defendant stumbled backward. The victim moved so quickly that the defendant could not get away. Out of fear, the defendant closed her eyes and swung with the steak knife in her hand in order to try to protect herself. She did not realize that she had cut the victim until she heard the victim shout that she was cut.

[8] The defendant testified that she was nervous and froze, and originally denied that she had cut the victim because she was scared and did not realize that the law allowed her to protect herself. The defendant then tossed the knife under a nearby vehicle. One witness, James Turner, testified that the whole altercation could not have lasted more than four seconds.

The defendant further testified that, when the victim came back outside to go to the hospital, the defendant did not see any blood on the victim and only knew that the victim had been cut. The defendant's cell phone was not charged so she was unable to call 911 to explain that she had just been attacked by the victim. Instead, she approached Atkins, who was on the telephone with the 911 dispatcher, and told her: "[M]ake sure you tell the cops that you guys came to jump me." As soon as the police arrived, the defendant approached an officer to explain what had happened.

[9] We note that the following portions of the self-defense instruction provided by the court are relevant to this claim on appeal: "The [test] you are to apply is a subjective objective test, meaning that it has some subjective aspects and some objective aspects. You must consider the situation from the perspective of the defendant; that is, what did the defendant actually believe as best as can be inferred from the evidence. This is the subjective

aspect of the test. . . .

"The first question you must ask is simply as a matter of fact whether the defendant actually, that is *honestly and sincerely*, entertained the belief in question when she acted as she did. . . . A defendant cannot justifiably act on her actual belief *however honestly or sincerely she held it* if that belief would not have been shared by a reasonable person in our circumstances viewing those circumstances from the defendant's point of view.

"[T]he defense of self-defense has four elements. One, that the defendant actually believed that someone was using or was about to use physical force against her. If you find that the force used by the defendant was deadly physical force, then this element requires that the defendant actually believed that the other person was, A, using or about to use deadly physical force against her or, B, was inflicting or about to inflict great bodily harm upon her. . . .

"Element three, that the defendant actually believed that the degree of force she used was necessary to repel the attack. Again, if you find that that force used by the defendant was deadly physical force, then this element requires that the defendant actually believed that deadly physical force was necessary to repel the attack. . . .

"Now, I'll go over these elements again in detail from that perspective. The first element is that when the defendant used offensive force against [the victim] she actually, that is honestly and sincerely, believed that the other person was using or about to use physical force against her. . . .

"If you have found that the force used by the defendant was deadly physical force, then you must find the defendant actually believed that [the victim] was not only using or about the use physical force upon her but that the other person, namely [the victim] . . . was either using or about to use deadly physical force against the defendant or inflicting or about to inflict great bodily harm upon her. . . .

"The act of [the victim] leading to the defendant's use of defensive physical force may not be [an] actual threat . . . or an actual assault. The test is not what the other person actually intended but what the other person's act caused the defendant to believe was the intention of the other. In other words, the danger to which the defendant was reacting may not have been . . . actual or real. In judging a danger to herself, the defendant is not required to act with infallible judgment. A person acting in self-defense is sometimes required to act instantly and without time to deliberate and investigate. Under some circumstances, it is possible . . . to perceive an actual threat when none, in fact, existed. . . .

"The third element is that when the defendant used physical force upon [the victim] for the purposes of defending herself she actually, that is honestly and sincerely, believed that the degree of force she used was necessary for that purpose. And this applies whether you have found that the defendant used deadly physical force or not. The question is whether the defendant believed that it was necessary to use the degree of force that she used to defend herself from the attack." (Emphasis added.)

[10] For a comprehensive doctrinal explanation of justification defenses such as self-defense, see *State* v. *Singleton*, 292 Conn. 734, 746–49, 974 A.2d 679 (2009), and *State* v. *Montanez*, 277 Conn. 735, 752–53, 894 A.2d 928 (2006).

[11] We note that, with respect to combat by agreement, the trial court charged the jury that "another circumstance under which a person is not justified in using any degree of physical force in self-defense against another is when the physical force is the product of an illegal combat by agreement. Under this provision, it is not necessary that there be a formal agreement. Such agreement may be inferred from the conduct of the parties. To infer such an agreement, you must look at all the circumstances leading up to and preceding the event in question as well as all of the circumstances surrounding this event itself based on the entire evidence presented in your own credibility assessments. *This exception would not apply despite an agreement for mutual combat if you find that the terms were violated by* [*the victim*] *and that her conduct* [*toward*] *the defendant was in violation of their agreement.* And further, that the defendant knew of such a violation. Violation means that [the victim's] use of force exceeded the terms of the agreement with the defendant and that it escalated beyond what they had then agreed to as . . . to either the extent or form of . . . combat.

"It is important to remember that the defendant has no burden of proof to prove that her use of physical force was not the product of a combat by agreement. To the contrary, you may only reject her defense on the basis of the statutory disqualification if you find that the state . . . has proved beyond a reasonable doubt that the defendant and . . . [the victim] had

engaged in . . . combat by agreement." (Emphasis added.)

We note that this instruction mirrors the pattern jury instruction promulgated by the Criminal Jury Instructions Committee, which is published on the Judicial Branch website. See Connecticut Criminal Jury Instructions (4th Ed. 2011) § 2.8-2 (C), available at http://www.jud.ct.gov/JI/criminal/part2/2.8-2.htm (last visited September 1, 2015).

For the challenged portion of the instruction pertaining to the burden of proof, see footnote 19 of this opinion.

[12] The Criminal Jury Instructions Committee cited the Appellate Court's decision in *State* v. *Abraham*, 84 Conn. App. 551, 854 A.2d 89, cert. denied, 271 Conn. 938, 861 A.2d 514 (2004), as authority for the pattern jury instruction utilized by the trial court in this case. The Appellate Court's opinion in *Abraham* recited, but did not address the legal accuracy of, the challenged instruction on this particular point and, therefore, is of minimal persuasive value in the present appeal. See id., 559–60 (considering whether sufficient evidence of combat by agreement existed when defendant claimed that he was mere bystander who had intervened in defense of another person).

[13] To this end, we note that § 53a-19, like much of our state's Penal Code, is modeled heavily after coordinate provisions of New York's Penal Code; although principles stated in the Model Penal Code are also informative in its interpretation. See, e.g., *State* v. *Pond*, 315 Conn. 451, 483, 108 A.3d 1083 (2015). The parties do not cite, and our independent research did not reveal, any on point New York cases under that state's identical combat by agreement statute. N.Y. Penal Law § 35.15 (McKinney 2009).

[14] The concurring justice criticizes our reliance on common-law principles to resolve this ambiguity as "inconsistent" with *State* v. *Singleton*, 292 Conn. 734, 974 A.2d 679 (2009), asking rhetorically how we "can use common-law principles to find an exception not explicitly written in this provision of the same statute when a party to a combat by agreement escalates the level of violence." As the concurrence accurately points out, in *Singleton*, we disagreed with a defendant's claim that the trial court had improperly failed to instruct the jury that "the initial aggressor using nondeadly force who is met with deadly force by the victim may be justified in using deadly force to repel the victim." Id., 764. We held that the defendant's argument was inconsistent with the "plain and unambiguous" language of § 53a-19 (c) (2), which "provides that the initial aggressor is justified in using physical force *only if he withdraws* from the encounter and certain other conditions are satisfied. It does not provide, or suggest, that an initial aggressor who uses nondeadly force is justified in using deadly force to repel the victim's unlawful escalation of force to the deadly level." (Emphasis added.) Id., 765. Our resort to common-law principles in this case is not inconsistent with *Singleton*, because that case concerned plain and unambiguous statutory language. In contrast, the present case presents statutory language that a majority of this court deems ambiguous as to the meaning of the term "agreement" under § 53a-19 (c) (3), rendering appropriate resort to common-law principles to resolve that ambiguity in accordance with the drafters' intent. See General Statutes § 1-2z.

[15] The American Law Institute followed this consent approach in drafting the Model Penal Code, which lacks an express combat by agreement provision. The commentary to the Model Penal Code notes that it "accomplished" that same principle insofar as it "allows forceful responses only to 'unlawful force' and defines that term . . . not to include force to which the recipient has consented." 1 A.L.I., Model Penal Code and Commentaries (1985) § 3.04, comment 3 (c), p. 47; see also id., § 3.11, p. 156 (" 'unlawful force' means force, including confinement, that is employed without the consent of the person against whom it is directed"). The commentary observes that the "question of consent presents a problem of some difficulty. It is desirable, on the one hand, to exclude from the range of protective force, especially of force employed for the protection of another, most cases in which the person sought to be protected has in fact consented, whether or not the law would otherwise give legal effect to the consent. Thus A and B may agree to fight under such conditions that they both are guilty of a crime and such that, according to some decisions, they have cross actions for battery against each other, their consent being denied legal effect." Id., § 3.11, comment 1, pp. 157–58.

[16] The Queensbury Rules were a "code of rules that most directly influenced modern boxing. Written by John Graham Chambers, a member of the British Amateur Athletic Club, the rules were first published in 1867 under the sponsorship of John Sholto Douglas, ninth marquess of Queensberry, from whom they take their name." Encylopaedia Brittanica, "Marquess

of Queensbury Rules," (2015), available at http://www.britannica.com/sports/Marquess-of-Queensberry-Rules (last visited September 1, 2015).

[17] See footnote 6 of this opinion.

[18] The concurrence also posits that, because "fights develop without advanced planning, and that we can find combat by agreement even without any express agreement to fight, it seems unlikely that the parties would establish specific terms, including the level of force to be used, prior to the commencement of the fight." We disagree with the concurrence's reliance on this speculative generalization, and instead emphasize that the existence of an agreement to fight, including any limitations on the type or amount of force permissible and the breach of those limitations, is a question of fact for the trier. See, e.g., *State* v. *Montanez*, supra, 277 Conn. 747–48.

[19] We note that the trial court directed the jury generally that the "state must not only prove beyond a reasonable doubt all of the elements of the crime charged in order to obtain a conviction, but must also disprove beyond a reasonable doubt that the defendant acted in self-defense. If the state fails to disprove beyond a reasonable doubt the defendant acted in self-defense, you must find the defendant not guilty despite the fact that you have found the elements of the crime proved beyond a reasonable doubt. The defendant has no burden of proof whatsoever [with] respect to this defense." After discussing the substantive elements of self-defense, the trial court again reminded the jury "that the defendant has no burden of proof regarding any of these elements. Instead, the state bears the sole and exclusive burden of proving beyond a reasonable doubt that the defendant did not act in self-defense . . . a burden that it can meet by disproving at least one of these elements beyond a reasonable doubt."

The trial court then repeated those burdens with respect to the statutory disqualifications, stating that "the state can defeat the defendant's claim of self-defense by proving one of the statutory disqualifications to the use of deadly physical force," including retreat and combat by agreement, and again emphasizing that the defendant "has no burden [of proof] whatsoever" with respect to either retreat or combat by agreement.

With respect to combat by agreement, after explaining the elements, the trial court instructed the jury that "[i]t is important to remember that the defendant has no burden of proof to prove that her use of physical force was not the product of a combat by agreement. To the contrary, you may only reject her defense on the basis of the statutory disqualification if you find that the state has proved . . . beyond a reasonable doubt that the defendant and [the victim] had engaged in . . . combat by agreement.

"I said this several times but it bears repeat[ing]. You must remember that the defendant has no burden of proof whatsoever [with] respect to the defense of self-defense. Instead, it is the state that must prove beyond a reasonable doubt that the defendant did not act in self-defense if it is to prevail on its charges of assault in the second degree and criminal attempt of assault in the first degree. To meet this burden, the state need not disprove all four of the elements of self-defense. Instead, it can defeat the defense of self-defense by disproving any one of the four elements of self-defense beyond a reasonable doubt to your unanimous satisfaction."